UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MICHAEL A. BRADY, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Case No. 06-CV-0282-CVE-PJC |
| | ) | |
| UBS FINANCIAL SERVICES, INC., and | ) | |
| GREATER SOUTHWEST FUNDING | ) | |
| CORPORATION, | ) | |
| | ) | |
| **Defendants.** | ) | |

### OPINION AND ORDER

Now before the Court is the Motion of Defendants to Dismiss (Dkt. # 11) filed by UBS Financial Services, Inc. ("UBS") and Greater Southwest Funding Corporation ("GSW"). Plaintiff Michael A. Brady ("Brady") brings this claim against UBS and GSW, UBS's alleged alter ego, for the payment of his Series B Zero Coupon Bonds ("B Bonds") individually and on behalf of other class members.[1] Brady claims that defendants have failed to pay the accreted value of the B Bonds as of the Stated Maturity dates.[2] Defendants argue that plaintiff's claim should be dismissed on the grounds that (1) there are prior pending state court proceedings and this claim is duplicative under principles of abstention; (2) the doctrine of res judicata applies based on the state court's denial of a motion to amend a complaint; and (3) the present claim is time-barred.

---

[1]  Plaintiff brings the claim "on behalf of himself and all others who are currently owners of B Bonds purchased by such owners on or subsequent to the effective date of the Prospectus and through the effective period of the Prospectus thereafter, and whose B Bonds have a Stated Maturity date that has passed as of the date of judgment (the "Class")." Dkt. # 2, ¶ 75.

[2]  The Stated Maturity dates vary for the different series of B Bonds, commencing with December 1, 1999 and extending through June 1, 2009.

**I.**

In 1985, GSW sold Series A Bonds and B Bonds to finance the construction of the Mid-Continent Tower in Tulsa, Oklahoma (the "Tower"). The bonds were issued pursuant to a Collateral Trust Indenture (the "Indenture") dated June 1, 1984. Dkt. # 12, Ex. 9. Reading & Bates Corporation ("R&B") subleased the Tower, and R&B's rent payments were used to pay the principal and interest on the bonds. In 1987, R&B defaulted on its sublease. As a result, GSW defaulted in making full payments due on the B Bonds and related Series A Bonds. On December 8, 1987, Shawmut Bank, the Indenture Trustee (the "Trustee"), provided written notice to both Series A and Series B bondholders that GSW was in default. R&B was soon released from its lease obligation and the Tower became a multi-tenant office building. On December 8, 1993, holders of more than 25% of the outstanding principal amount of the Series A Bonds sent the Trustee a Notice of Acceleration. On December 24, 1993, the Trustee informed all B Bondholders of this Notice of Acceleration. The letter read, "Under Section 9.02 of the Indenture, the principal amount of the Series A Bonds and the Compound Accreted Value (as defined in the Indenture) of the Series B Bonds thereby became due and payable on December 8, 1993." Dkt. # 12, Ex. 10.

In 1994, the Trustee commenced a foreclosure action in the Tulsa County District Court.[3] UBS was not named as a defendant in the Foreclosure Action. On June 13, 1995, plaintiff John R. Roberson, representing himself and a class of B Bondholders, intervened in the Foreclosure Action,

---

[3] This case is <u>Shawmut Bank, N.A. v. Fourth Street Associates, Greater Southwest Funding Corporation, RMM Corporation, Blythe Eastman PaineWebber Servicing, Inc., Reading & Bates Corporation</u>, Case No. CJ-94-03054 (Tulsa County District Court) (the "Foreclosure Action").

asserting that the Trustee wrongfully favored holders of the Series A Bonds and failed to maximize recovery. See Dkt. # 12, Ex. 1, Foreclosure Action Docket Sheet.

In 1996, in a separate action, Roberson filed a petition against GSW, UBS, and other defendants in state court claiming breach of contract and fraud.[4] In April 2000, the B Bondholders moved for class action certification, but the court denied this motion on December 19, 2001. Dkt. # 12, Ex. 2, Roberson Action Docket Sheet. The Oklahoma Court of Civil Appeals affirmed this decision. See Roberson v. PaineWebber, Inc., 81 P.3d 688 (Okla. Civ. App. 2003).

In 1997, Stephens Property Company ("SPC"), a B Bondholder, brought an action against GSW and UBS, under an alter ego theory of liability, in this Court.[5] On September 30, 1998, Judge Michael Burrage granted defendants' motion for summary judgment on the grounds that plaintiff's complaint was barred and that, as a matter of law, plaintiff had not presented sufficient evidence on the alter ego theory.

On December 29, 2005, the B Bondholders sought leave to file a fifth amended petition in intervention in the Foreclosure Action, asserting for the first time a breach of contract claim and seeking to add UBS as a defendant under the alter ego theory of liability. On June 22, 2006, the state court denied this motion. Dkt. # 12, Ex. 7. The B Bondholders filed a motion for reconsideration of that denial. Dkt. # 12, Ex. 8.

---

[4] This case is John R. Robertson and David B Madill v. PaineWebber, Inc., PaineWebber Group, Inc., Lehman Brothers, Inc., Smith Barney, Inc., Fleet National Bank of Massachusetts, N.A., Blyther Eastman PaineWebber Servicing, Inc., Fourth Street Associates, RMM Corporation, AJ Corporation, Greater Southwest Funding Corporation, PHC Corporation, and Midtown Associates Limited Partnership, Case No. CJ-96-01455 (Tulsa County District Court) (the "Roberson Action").

[5] The case was Stephens Properties Company v. PaineWebber Inc., and Greater Southwest Corporation, Case No. 97-CV-045 (N.D. Okla.) (the "Stephens Action").

Plaintiff Brady now brings this claim, on behalf of himself and other B Bondholders, against GWS and UBS, under the same alter ego theory of liability.

## II.

When reviewing a motion to dismiss under Rule 12(b)(6), the court must construe the allegations of the complaint as true and view the allegations in the light most favorable to the nonmoving party. Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1231 (10th Cir. 2002). The Tenth Circuit has referred to dismissal under Rule 12(b)(6) as a "harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006) (citing Duran v. Carris, 238 F.3d 1268, 1270 (10th Cir. 2001)). A Rule 12(b)(6) motion "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Sutton v. Utah State School for the Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999).

## III.

In Oklahoma, the statute of limitations for breach of a written contract is five years. OKLA. STAT. tit. 12, § 95(A)(1). "The limitation period for a breach-of-contract claim accrues when the party asserting it first acquires the right to sue." Kinzy v. State of Oklahoma, 20 P.3d 818, 823 (Okla. 2001). Here, the primary question is when Brady and other B Bondholders had the right to sue based on the default.

Defendants argue that the claim accrued in December 1993, when bondholders exercised the acceleration option, as provided in section 9.02 of the Indenture. According to section 9.02:

4

> If an Event of Default[6] occurs and is continuing, then and in every such case the Trustee or the Holders of not less than 25% in principal amount of the Bonds Outstanding and, in the case of a default prior to September 1, 1994 under Section 9.01A relating to payments on any series, the Holders of not less than 25% in principal amount of the Bonds Outstanding of such series may declare the principal of *all the Bonds to be due and payable immediately*, by a notice in writing to the Company (and to the Trustee, if given by Bondholders), and upon any such declaration such principal, or, in the case of Zero Coupon Bonds, the Compound Accreted Value thereof, shall become immediately due and payable.

Dkt. # 12, Ex. 9, at 116 (emphasis added). On December 8, 1993, after GSW defaulted in making full payment of principal and interest due on the B Bonds and related Series A Bonds, holders of more than 25% of the outstanding principal amount of the Series A Bonds sent the Trustee a Notice of Acceleration. In response, on December 24, 1993, the Trustee sent B Bondholders a letter, which stated, "Under Section 9.02 of the Indenture, the principal amount of the Series A Bonds and the Compound Accreted Value (as defined in the Indenture) of the Series B Bonds thereby became due and payable on December 8, 1993." Dkt. # 12, Ex. 10. Defendants argue that, at the time the Series A Bondholders exercised the acceleration clause, the B Bonds also became payable immediately. Therefore, defendants argue that plaintiff's claim accrued in 1993, over twelve years ago, and that the statute of limitations has passed.

Plaintiff claims that the "acceleration clause in the Indenture upon which the Series A Bondholders declared the Bonds to be 'due and payable' accelerated the Bonds only for foreclosure purposes." Dkt. # 22, at 20. Plaintiff cites several cases, none of which are Oklahoma cases, where courts ruled that the acceleration clause applied only for the purpose of foreclosure by the trustee. For example, in <u>Oster v. Buildings Dev. Co.</u>, 252 N.W. 168 (Wis. 1934), the Wisconsin Supreme

---

[6]     "Event of Default" is defined in section 9.01 of the Indenture. It includes failure to make payments on principal or interest.

5

Court held, "The acceleration clause permitting the trustee, upon default, and requiring him upon request of the bondholders, to declare the entire sum of the bonds due, must, under all the circumstances of this case, be considered to mature the bonds solely for the purposes of foreclosure by the trustee and execution by it of the trusts provided for in the trust deed." Id. at 171. However, plaintiff fails to note that the Wisconsin Supreme Court's reason for this decision was the "clear and unambiguous manner in which this trust deed has reserved to the trustee the right to sue on the debt and to foreclose." Id. In Oster, the contract provided that no bondholder had the right to institute any suit. Id. Because the bondholders were expressly prohibited from bringing a legal action, the court determined that the acceleration clause did not pertain to the bondholders, but only to the trustee. The same rationale applies to another case to which plaintiff cites, Morton v. Rock Bottom Coal Co., 112 S.E. 396 (W. Va. 1922). There, the court determined that the acceleration clause did not operate to mature the bonds for any purpose other than for foreclosure because any right of action was vested completely in the trustee. The indenture agreement stated that "under no circumstances shall any holder or any number of holders of bonds or coupons have any right to institute an action or other proceeding under said indenture." Id. at 400.

Whether an acceleration clause applies only for purposes of foreclosure depends on the language of the particular indenture agreement. According to Fletcher Cyclopedia of the Law of Corporations,

> The right of a bondholder to sue on bonds accrues on their maturity, but provisions in the mortgage respecting the effect of defaults in payment of interest or the like may accelerate the maturity of the debt, *not only for the purposes of sale or foreclosure by the trustee, but also so far as the right of individuals bondholders to sue is concerned.* Of course, primarily, the solution of this question depends on the wording of the mortgage or deed of trust.

6A FLETCHER CYC. CORP. § 2752 (emphasis added).  Here, unlike the cases cited by plaintiff, the Indenture makes clear that bondholders themselves can declare "the principal of *all the Bonds to be due and payable immediately*." Dkt. # 12, Ex. 9, at 116 (emphasis added).  Additionally, the back of the B Bond certificates read: "If an Event of Default, as defined in the Indenture, shall occur, the Compound Accreted Value of the Bonds may become or be declared due and payable in the manner and with the effect provided in the Indenture." Dkt. # 2, Ex. 1.  Thus, under the clear language of the Indenture and the B Bonds, the acceleration clause cannot be read to apply solely for the trustee's foreclosure purposes; on the contrary, the acceleration clause applies to the rights of individual bondholders to sue.

Further, the Court notes that, in the Stephens Action, this Court determined that the B Bondholders' claim accrued in 1993: "Following a moratorium period, on December 24, 1993, the Trustee gave notice of acceleration of the Bonds pursuant to Section 9.02 of the Indenture.  As a result of the notice of acceleration, the unpaid principal balance of the Series A Bonds and the compound accreted value of the Series B Bonds became due and payable on December 8, 1993." Case No. 97-CV-045-BU, Dkt. # 12, Ex. 4, at 97-98.  Indeed, plaintiff SPC, who was represented by the same attorneys who currently represent Brady, sought to exercise its right to payment under the acceleration clause.  The Court noted, "SPC is not attempting to collect on a matured bond based upon a promise to pay.  Rather, it is seeking to enforce the acceleration of the Series B Bonds following the Trustees's declaration of an Event of Default." Id. at 100.  "According to SPC, the Series B Bonds have been accelerated and have reached maturity, thereby resulting in the 'due dates expressed' in the bonds." Id. at 102.  Of course, in the Stephens Action, the declaration of acceleration did not bar plaintiff SPC's claim because SPC brought that action before the five year

7

statute of limitations had run. Rather, SPC's recovery depended on the declaration of acceleration because, at the time of the Stephens Action, the Stated Maturities dates had not passed. However, now that more than twelve years have passed since the declaration of acceleration in 1993, plaintiff in this case argues precisely the opposite of that argued by plaintiff SPC in the Stephens Action. But attorneys for Brady and SPC cannot have it both ways; the declaration of acceleration cannot apply to the B Bondholders in the Stephens Action, and then fail to apply to the B Bondholders in this action.

The Court also notes that plaintiff has misconstrued Judge Burrage's 1998 opinion. Plaintiff states, "United States District Judge Burrage of this Court specifically rules that there was no right, unconditional or otherwise, for [SPC] to sue upon acceleration, rather [SPC] was remitted to a suit upon the Stated Maturity dates of its B Bonds. Of critical importance to Judge Burrgage's 1997 [sic] is that NO BONDS HAD MATURED AT THAT TIME." Dkt. # 22, at 24 (emphasis in original). This description of Judge Burrage's opinion is, quite clearly, incorrect. Judge Burrage did not determine that the B Bonds had not matured at the time he rendered that decision. Rather, he determined that SPC's claim was barred because it did not comply with the "No Action" clause in Section 9.11[7]; thus, SPC could not proceed with its claim. Dkt. # 12, Ex. 4, at 103.

In his second argument that the statute of limitations has not run, plaintiff points to section 9.12 of the Indenture, entitled "Unconditional Right of Bondholders to Receive Principal, Premium and Interest," which reads:

---

[7] Section 9.11 states that no bondholder has the right to institute any proceeding or judicial action unless he or she follows certain steps, such as providing written notice to the Trustee. Dkt. # 12, Ex. 9, at 128.

> Notwithstanding any other provision in the Indenture, the Holder of any Bond shall have the right which is absolute and unconditional to receive payment of the principal of (and premium, if any) and interest on such Bond on the respective Stated Maturities expressed in such Bond (or, in the case of redemption, on the Redemption Date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

Dkt. # 12, Ex. 9, at 129-30.  Plaintiff contends that this "absolute and unconditional" right to receive payment on the Stated Maturities of the bonds means that, regardless of any exercise of acceleration, plaintiff can demand payment and initiate legal action as of the Stated Maturities expressed in the bonds.  The Indenture defines "Stated Maturity" as "the date specified in such Bond or the coupon representing such installment of interest as the fixed date on which the principal of such Bond or such installment of interest is due and payable."  Dkt. # 12, Ex. 9, at 35.  Thus, plaintiff argues that the "earliest date of accrual for the Stated Maturity of the first series was December 1, 1999."  Dkt. # 22, at 26.

Plaintiff's argument runs counter to other provisions in the Indenture, however.  The Indenture defines "'Maturity' when used with respect to *any Bond* [to mean] the date on which the full amount of such principal of such Bond becomes due and payable as therein or herein provided, whether at the Stated Maturity *or by declaration of acceleration* or call for redemption or otherwise."  Dkt. # 12, Ex. 9, at 29 (emphasis added).  Plaintiff argues that the use of the phrase "Stated Maturity," as opposed to "Maturity," indicates that bondholders can sue on the fixed date rather than the earlier acceleration date.  However, this interpretation is counter-intuitive.  The Indenture clearly provides that all bonds can mature as a result of the declaration of acceleration. If that is the case, then it is illogical that the B Bondholders' claim accrued after the declaration of acceleration and then accrued *again* upon Stated Maturity.  As noted above, plaintiff's attorneys cannot "have it both ways" and get two bites at the apple.  Ultimately, the plain language of the

Indenture makes clear that the B Bondholders had the right to commence an action in December 1993. At that time, their claim accrued, and more than twelve years have passed since that time. Thus, as a matter of law, the statute of limitations bars plaintiff's claim.

"The enactment of a statute of limitations is a legislative expression of policy 'that prohibits litigants from raising claims after the expiration of a given period of time.'" Kinzy, 20 P.3d at 823. The statute of limitations is meant to protect defendants from claims, like this one, that have lingered too long. Multiple suits, all with the assistance of plaintiff's attorney, are pending regarding the B Bondholders' right to recover as a result of the default. Twelve years after plaintiff's claim accrued, plaintiff cannot file suit in this Court to seek another forum for recovery. Thus, based on the statute of limitations, the Court grants defendants' motion to dismiss. Additionally, since plaintiff's claim is time-barred, the Court need not address defendants' remaining two arguments for dismissal, based on the abstention doctrine and res judicata.

## IV.

**IT IS THEREFORE ORDERED** that the Motion of Defendants to Dismiss (Dkt. # 11) is **granted**. This is a final order terminating this case.

**DATED** this 10th day of October, 2006.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT